UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


**UNITED STATES OF AMERICA,**          :
                                       :
                    **Plaintiff,**     :    Criminal Action
                                       :    No. 1:21-mj-00279
          **v.**                       :
                                       :    August 13, 2021
**ANTHONY AYEAH,**                     :    2:37 p.m.
**ONYEWUCHI IBEH,**                    :
**JASON JOYNER,**                      :
**MOUAAZ ELKHEBRI,**                   :
                                       :
                                       :
                                       :
                    **Defendant.**

.............................


**TRANSCRIPT OF PRELIMINARY HEARINGS**
**BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

APPEARANCES:

  For the United States:      CHRISTOPHER HOOD, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
                              2100 Jamieson Avenue
                              Alexandria, VA 22314


  For Defendant Joyner:       CRYSTAL MELEEN, ESQ.
                              KEATS & MELEEN, PLC
                              10521 Judicial Drive, Suite 310
                              Fairfax, VA 22030

  For Defendant Elkhebri:     JOAN ROBIN, ESQ.
                              LAW OFFICE OF JONI ROBIN, PLLC
                              114 N. Alfred Street
                              Alexandria, VA 22314

  For Defendant Ayeah:        DREWRY HUTCHESON, JR., ESQ.
                              McGINLEY ELSBERG & HUTHESON, PLC
                              627 South Washington Street
                              Alexandria, VA 22314

1   Court Reporter:              Diane Salters, CSR, RPR, RCR
                                Official Court Reporter
2                               United States District Court
                                401 Courthouse Square
3                               Alexandria, VA 2231-5798
                                Email: Dianesalters.edva@gmail.com
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  (Proceedings reported by machine shorthand from an FTR Gold
    recording; transcript produced by computer-aided transcription.)

THE COURTROOM DEPUTY:  *United States vs. Ayeah, et al.*,
Case No. 21-mj-279.  Will the parties please note their
appearances.

MR. HOOD:  Good afternoon, Your Honor.  Chris Hood on
behalf of the United States.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Will counsel please note their
appearance for the record.

MS. ROBIN:  Good afternoon, Your Honor.  Joan Robin on
behalf of Mr. Elkhebri.

THE COURT:  Good afternoon, Ms. Robin.

MS. MELEEN:  Crystal Meleen on behalf of Mr. Joyner.

THE COURT:  Good afternoon, Ms. Meleen.

MR. HUTCHESON:  Good afternoon, Your Honor.  Drewry
Hutcheson representing Mr. Anthony Ayeah.

THE COURT:  Good afternoon, Mr. Hutcheson.  Nice to see
you.  And Mr. Hood is here on behalf of the government.

Well, I set this matter down for today so that we could
have the efficiency of having a single preliminary hearing for
all defendants who have been released on bond.  Unfortunately,
I've been informed that Mr. Jenkins is running late.  I don't
know if he had a conflict with another court appearance, but he
is not available for a time that, I don't think, works for
everybody else, unfortunately.  I'm inclined to go forward with
the three preliminary hearings now because you are here and your

1    clients are here.

2         Mr. Ayeah -- yes, your attorney is not here.  He did --

3         DEFENDANT IBEH:  Ibeh.

4         THE COURT:  Mr. Ayeah?

5         DEFENDANT IBEH:  Ibeh.

6         THE COURT:  Ibeh?

7         DEFENDANT IBEH:  Yes, sir.

8         THE COURT:  But I thought -- I'm sorry.  Who are you

9    representing, Mr. Hutcheson?

10        MR. HUTCHESON:  Ayeah.

11        THE COURT:  Okay.  Mr. Ibeh --

12        DEFENDANT IBEH:  Yes, sir.

13        THE COURT:  -- your attorney is Mr. Jenkins, and he's got

14   a conflict.  Again, I don't know what is holding him up, but

15   things happen.  That's all right.  The goal was to try and do

16   this all at one time for your sakes, but also for the

17   government's sake.  You are not in any way prejudiced by this,

18   but it, of course, is not fair for us to go forward without your

19   attorney here and participating.  So what I'm going to do is go

20   forward for the three defendants whose attorneys are here.  You

21   will have to come back on another day, and you will have the same

22   opportunity that these defendants have had to contest probable

23   cause, or to have a preliminary hearing.  You may step out of the

24   jury box and back into the -- outside the well of the court.  I

25   don't want there to be any confusion on the record about

1   what's --

2          DEFENDANT IBEH:  Yes, sir.

3          THE COURT:  -- going on here.  So, again, none of this

4   counts against you in any way, and Mr. Jenkins will contact the

5   Court and we'll be able to reschedule this.

6          Does anyone have an objection to going forward under these

7   circumstances?

8          MR. HUTCHESON:  No, Your Honor.

9          MS. MELEEN:  No objection.

10         MR. HOOD:  No, Your Honor.

11         THE COURT:  Very good.  Then you may call your first

12  witness, Mr. Hood.

13         MR. HOOD:  Your Honor, the United States calls Special

14  Agent Ethan Papish.

15         (ETHAN PAPISH, ON BEHALF OF THE GOVERNMENT, SWORN)

16         THE COURT:  Before we begin, let me just make clear,

17  Agent, if you are comfortable and fully vaccinated, you may take

18  off your mask and answer.  It may be easier to hear.

19         Likewise, Counsel, if you are asking questions and you're

20  fully vaccinated, you may take off your masks to question

21  witnesses.  If anyone is uncomfortable with that, you may object

22  now.  And you're certainly not required to remove your mask at

23  any time.  Very good.  You may proceed.

24         MR. HOOD:  Thank you, Your Honor.

25                      DIRECT EXAMINATION

BY MR. HOOD:

**Q.**     Please state and spell your last name for the record.

**A.**     Ethan Papish, E-T-H-A-N  P-A-P-I-S-H.

**Q.**     And are you employed?

**A.**     Yes.

**Q.**     And how are you employed?

**A.**     As a special agent with the Secret Service.

**Q.**     And how long have you worked for the Secret Service?

**A.**     Two years.

**Q.**     Can you describe some of your duties?

**A.**     Investigating fraudulent activity, cyber fraud, protective investigations.

**Q.**     Have you received any training in connection with these duties?

**A.**     Yes, I have.

**Q.**     Can you tell us a little bit about that training?

**A.**     Training on investigative techniques, investigative operations, cyber electronics, stuff like that.

**Q.**     Special Agent Papish, are you the primary officer assigned to this matter?

**A.**     Yes, I'm one of three primary officers.

**Q.**     Okay.  And did you have an opportunity to familiarize yourself with this matter?

**A.**     Yes.

**Q.**     Special Agent Papish, how many defendants are in this

1   case?

2   **A.**    Four.

3   **Q.**    Do you see the defendants in the courtroom today?

4   **A.**    I see three of them, yes.

5   **Q.**    Okay.  And I'm going to ask you to identify the

6   defendants by what they're wearing.  Starting with Mr. Ayeah,

7   can you please identify Mr. Ayeah by what he is wearing?

8   **A.**    He's wearing a black zip-up jacket.

9        MR. HOOD:  Your Honor, may the record reflect that the

10   witness has identified Mr. Ayeah?

11        THE COURT:  It will so reflect.

12   BY MR. HOOD:

13   **Q.**    Special Agent Papish, can you identify Mr. Elkhebri by

14   what he's wearing?

15   **A.**    He's wearing a red- and black-colored shirt.

16        MR. HOOD:  Your Honor, may the record reflect that the

17   witness has identified Mr. Elkhebri?

18        THE COURT:  It will so reflect.

19   BY MR. HOOD:

20   **Q.**    And, Special Agent Papish, can you identify Mr. Joyner by

21   what he is wearing?

22   **A.**    He's wearing a gray with black striped colored shirt.

23        MR. HOOD:  Your Honor, may the record reflect that the

24   witness has identified Mr. Joyner?

25        THE COURT:  Yes, it will so reflect.

BY MR. HOOD:

**Q.**     Special Agent, did you prepare and review an affidavit in support of an arrest warrant in this case?

**A.**     Yes, I did.

**Q.**     I'd like to direct you to what has been marked as Government's Exhibit 1 and docketed in this case ECF No. 2.  Do you recognize this document?

**A.**     Yes, I do.

**Q.**     And what is it?

**A.**     It is a criminal complaint charging codefendants with wire fraud.

**Q.**     And is this document consistent with your understanding of the matter based on the sources of information that you are familiar with?

**A.**     Yes.

**Q.**     And do you incorporate and adopt the facts as set forth in this affidavit as part of your testimony?

**A.**     Yes.

**Q.**     Is the information contained in this affidavit a true and accurate reflection of the facts as known to you?

**A.**     Yes.

         MR. HOOD:  Your Honor, at this time, the United States moves that the affidavit marked as Government's Exhibit 1 be entered into evidence.

         THE COURT:  Is there any objection?

MR. HUTCHESON:  No objection, Your Honor.

MS. MELEEN:  No objection.

MS. ROBIN:  No objection.

THE COURT:  It will be admitted without objection.

MR. HOOD:  Thank you, Your Honor.

(Government's Exhibit No. 1 was received in evidence.)

BY MR. HOOD:

Q.   Just a few more questions, Special Agent Papish.

Does this affidavit describe a scheme to defraud?

A.   Yes.

Q.   And can you tell us a little bit about that scheme?

A.   Yes.  So a typical BEC, Business Email Compromise.  The suspicious individuals will gain access to business networks either through -- generally, through phishing or malware.  Once in there, they'll monitor the business network, get familiar with the individuals involved; generally, with those that have access to the ability to wire money.  Once they have a familiarity with the business and once -- generally, when a business has already sent out a request for funds, they'll use that email address, use a similar one to send out to the same individual saying the bank account has changed.  They might use other information with the business to give it legitimacy in the email, and the other company, recognizing that or thinking that they recognize it, sends the money to the new bank account.

In turn, that bank account is a mule account, a

fraudulent account.  Once it gets into that account, it is
quickly withdrawn and spread out -- throughout.

**Q.**     Thank you.  So if I refer to those first accounts that
the money comes to as the mule account, will you understand what
I mean?

**A.**     Yes.

**Q.**     And if I refer to those subsequent accounts as the other
conspirator accounts, will you understand what I mean?

**A.**     Yes.

**Q.**     Okay.  Does the complaint describe a specific instance of
a BEC scheme involving the three defendants here?

**A.**     Yes.

**Q.**     Okay.  In general, when did that fraud occur?

**A.**     It occurred, in general, late 2018, early 2019.

**Q.**     Okay.  And are all three defendants involved in this
matter?

**A.**     Yes.

**Q.**     Okay.  So let's start with Mr. Elkhebri.  How do you know
that he was involved in this fraudulent scheme?

**A.**     Through -- excuse me -- through subpoenas for financial
institutions as well as internet service providers, we saw that
Mr. Elkhebri's name was on the signature card for some of the
fraudulent accounts.  We also recognized that he was, while
working for a bank, opened accounts for other individuals
involved in the scheme.

**Q.**     Okay.  Now, moving to Mr. Ayeah, what evidence did you

have that the investigation uncovered that he's involved in this

scheme?

**A.**     We have his name, his signature card on the opening of

some of the fraudulent accounts, the second-level accounts, as

well as still and video evidence of him withdrawing money in

support of this.

**Q.**     And, finally, what evidence did the investigation uncover

that Mr. Joyner is involved in this scheme?

**A.**     His name on the signature card on some of the accounts

and as well as still and video evidence of him withdrawing money

from fraudulent accounts.

**Q.**     So based on your investigation, were you able to conclude

that the defendants used interstate wires in furtherance of the

schemes?

**A.**     Yes.

**Q.**     And just a few examples of how they used those interstate

wires.

**A.**     ATMs, monitoring the accounts, withdrawing of money to

servers across state lines.

**Q.**     All right.  Thank you.  No further questions, Your Honor.

THE COURT:  Thank you.  Cross-examination?  Would you like

to start, Mr. Hutcheson?

MR. HUTCHESON:  Thank you, Your Honor.  I actually joined

wearing my mask here, but I am vaccinated and will remove it with

1     the Court's permission --

2            THE COURT:  That's fine.

3            MR. HUTCHESON:  -- while I'm here.

4                       CROSS-EXAMINATION

5     BY MR. HUTCHESON:

6     **Q.**     Good afternoon, sir.

7     **A.**     Good afternoon.

8     **Q.**     Paragraph 6 of your affidavit describes conspirators

9     monitored companies, vendors, and billing systems and styles of

10    communication.  Could you expound on that and tell the Court how

11    that kind of surveillance -- if that's the right word -- was

12    taken on?

13    **A.**     The majority of this evidence was through subpoenas,

14    whether through bank accounts or for the cameras during the

15    dates in which they were withdrawing or somehow using the ATMs,

16    as well as internet service providers.

17    **Q.**     That paragraph reads to me as though you-all who were

18    investigating this case have an understanding on how the

19    conspirators were monitoring billing systems, styles of

20    communications, et cetera.  How were you-all able to discern

21    such a pattern?

22    **A.**     Through the subpoenas.  It provides email accounts listed

23    on it as well -- on who has access to when people access the

24    bank accounts electronically, like the online banking to monitor

25    the transactions.

1   **Q.**    Thank you.  Now, paragraph 8 mentions domain names --

2   excuse my computer illiteracy -- but aren't those more for

3   websites than for emails?

4   **A.**    Emails have domain names associated with them as well,

5   dot coms, dot govs.

6   **Q.**    Those are the same thing as domain names?

7   **A.**    Correct.

8   **Q.**    And so this look-alike plan would have a domain name that

9   would fool me because it's so close; without close scrutiny, it

10   looks like it's from the sender I was expecting.  Is that the

11   way that works?

12   **A.**    Correct.

13   **Q.**    Now, in paragraph 10, you mention that UCC-1 was matched

14   with law enforcement systems.  Does that indicate that UCC-1 has

15   a criminal record?

16   **A.**    I do not recall the criminal -- the criminal record of

17   UCC-1.

18   **Q.**    Excuse me?

19   **A.**    I do not recall the criminal record of UCC-1.

20   **Q.**    Why would there be law -- why would he be -- he or she be

21   in law enforcement systems?

22   **A.**    Generally, as law enforcement, we have access to

23   databases, such as Open Source.  When we got the subpoenas,

24   UCC-1's name was attached to the account.  We then ran it

25   through DMV, all this stuff, just to see if the name correlated

1    with those systems.

2    Q.    Thank you.

3          Now, paragraph 16 references an account being closed for,

4    quote, loss prevention closing entry.  Was that a real internal

5    bank entry?  That was a legitimate bank entry?

6    A.    Yes.

7    Q.    And what triggered that entry?  In that, I'm asking was

8    the bank already cooperating with your investigation when they

9    closed that account, with that statement?

10   A.    To the best of my knowledge, that was -- that was already

11   closed.  The bank account actually informed the UCC-1 that they

12   were closing the bank account for fraudulent activity.

13   Q.    On the same subject, for instance, paragraphs 43 and 45

14   state that businesses would file a complaint, but your affidavit

15   doesn't state with whom a complaint was filed or what -- could

16   you tell us a little bit about that process as the bank files a

17   complaint?

18   A.    The victim has access to websites that we monitor to

19   provide complaints that their money was defrauded.  Once we got

20   those complaints, we interviewed them to confirm that that was

21   the case, to get their information.

22   Q.    So is it up to the victim entity, the company, to know

23   that they can go on your agency's website and report complaints?

24   A.    Yes.  They went and provided the complaint.  It

25   correlated with some of the information that we were seeing, so

1   that's how we knew to talk to them.

2   Q.    So they initiated any law enforcement reference by filing

3   a complaint?

4   A.    Correct.

5   Q.    And that was done through your U.S.S.S. website?

6   A.    Not through our website, no.

7   Q.    Through what website?

8   A.    It's called IC3.  It's the website that they know to go

9   to to provide their -- a complaint when something like that

10  happens.

11  Q.    So most business loss prevention officers are aware of

12  this system?

13  A.    To my knowledge, yes.  If not, they might call us and

14  we'll inform them to either make a complaint on that website or

15  through their local law enforcement.

16  Q.    Lastly, toward the end of your affidavit, it appears that

17  a number of different individuals called "uncharged

18  co-conspirators" were involved in opening bank accounts.  Why do

19  you believe that so many separate individuals were utilized to

20  open bank accounts?

21  A.    Can you rephrase that or --

22  Q.    Surely.

23  A.    Thank you.

24  Q.    Toward the end of your affidavit, it indicates a number

25  of uncharged co-conspirators opening bank accounts, and my

1    question is do you have a theory on why numerous people were

2    utilized to open bank accounts rather than just one or two

3    people?

4    **A.**    Yes.

5    **Q.**    And what is that opinion?

6    **A.**    My opinion is that you want to be able to open -- you

7    don't want to use the same account multiple times in reference

8    to UCC-1 that was closed for fraud prevention.  These

9    first-level mule accounts are opened for a short amount of time;

10   very little money, generally minimum money involved in it.  Once

11   the money went into the account, it was quickly pulled out, and

12   there's generally not much activity going on for those accounts

13   besides that.  So my opinion is that they -- they were trying to

14   make sure that they were continually using accounts without

15   getting too much scrutiny.

16   **Q.**    Without getting too much --

17   **A.**    Scrutiny.

18   **Q.**    I see.  All right.  Thank you, sir.

19         MR. HUTCHESON:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         Ms. Robin?  Ms. Meleen?

22                     CROSS-EXAMINATION

23   BY MS. ROBIN:

24   **Q.**    Good afternoon, Agent.

25   **A.**    Good afternoon.

**Q.** So the affidavit contains a lot of information that's gleaned from financial records?

**A.** Correct.

**Q.** I imagine the investigation also included requests for account and/or ownership records related to the fraudulent domain and fraudulent email addresses, correct?

**A.** Are you asking if we subpoenaed the fraudulent domains?

**Q.** If you subpoenaed and/or requested records at all in any other manner related to those, yes, whether by subpoena or just for contacting --

**A.** Yes.

**Q.** -- them and requesting it voluntarily be provided.

**A.** Yes.

**Q.** Yes, okay. And so did any of those records establish any sort of connection between those fraudulent domain names or fraudulent email addresses and Mr. Elkhebri?

**A.** I do not recall that.

**Q.** Okay. Would you agree that if there were records that established evidence connecting those fraudulent domain names or fraudulent email addresses to Mr. Elkhebri, that would have been something you would have put in the affidavit?

**A.** Again, I can't recall that, but --

**Q.** Would you agree it would be important in a fraud scheme --

**A.** Yes, it would be important in an affidavit, correct.

1   **Q.**     Paragraph 3 of the indictment says that the conspiracy is

2   alleged to have begun on and around January 1st of 2018, but the

3   earliest fraudulent transaction that's discussed in the

4   affidavit is July 3rd of 2018.  Can you tell me what evidence

5   there is that Mr. Elkhebri participated in a conspiracy prior to

6   July 3rd of 2018?  I should say participated in this conspiracy.

7   **A.**     The investigation started the early looking into it.  I

8   can't recall specific evidence on earlier than that.

9   **Q.**     Okay.  Is there -- would you agree with me, though, that

10  this affidavit, the earliest fraudulent BEC scheme that's

11  referenced is the one where transactions are deposited on

12  July 3rd?  I believe it's Victim Number -- let's see -- from

13  Victim Number 4.

14  **A.**     I'm sorry, can you repeat?  You're asking if --

15  **Q.**     Sure.  The earliest fraudulent action that took place,

16  according to this affidavit, appears to be connected to -- it

17  appears to have taken place on July 3rd when funds were

18  deposited in connection with the fraud on Victim 4; is that

19  correct?

20  **A.**     To the best of my knowledge, yes.

21  **Q.**     Okay.  So to be clear, you're not aware of any evidence

22  of specific fraudulent conduct by Mr. Elkhebri before that

23  July 3rd date?

24  **A.**     This investigation focused primarily on the six victims

25  that filed the complaints, so we were able to follow the money

1   for those six victims.

2   **Q.**    Okay.  When you say "six victims," there are four BEC

3   schemes identified here.  Do you mean six victims in connection

4   with those four schemes that are discussed in this affidavit, or

5   are you talking about two additional victims?

6   **A.**    Correct.  So we -- the entirety of the case focused on --

7   there's the U.S. victims and there's overseas victims.  We

8   focused primarily on the U.S. victims in this case.

9   **Q.**    Okay.  But I just want to make sure -- and I may not be

10  asking it well -- I just want to make sure I understand.  When

11  you're talking about six victims, you're talking about the six

12  victims involved in these four BEC schemes that are identified

13  in the affidavit, not two additional BEC schemes?

14  **A.**    Correct.

15  **Q.**    All right.

16        MS. ROBIN:  Court's indulgence.

17  **Q.**    And the affidavit also mentions that this conspiracy is

18  alleged to have lasted until on or about March 31st of 2020, yet

19  the latest fraudulent action that's mentioned in this affidavit

20  is April 2019.  Can you tell me what evidence, if any, you have

21  or the government has that Mr. Elkhebri continued to engage in a

22  fraudulent conspiracy after the last act that's identified in

23  this affidavit?

24  **A.**    I don't recall the specific piece of evidence.

25  **Q.**    Okay.

**A.**     We listed that date --

**Q.**     Okay.  Do you recall generally?

**A.**     We listed that date for the four -- combining the four

individuals, so we listed that date as the end of the scheme.

**Q.**     Okay.  But just to be clear, you're not aware of any

other BEC schemes after April 2019 involving this conspiracy,

are you?

**A.**     Not to my knowledge.

**Q.**     Okay.  All right.  Let's move to paragraph 11.

Paragraph 11 states that the Wells Fargo account ending in 9986,

which I guess is a mule account --

**A.**     Correct.

**Q.**     -- associated with the fraud on Victim 1, it states that

that belonged to UCC-1.  In the course of your investigation,

did you uncover any evidence that Mr. Elkhebri personally knew

UCC-1?

**A.**     No.

**Q.**     Okay.  Paragraph 20.  Paragraph 20 mentions the fact that

each of the transactions from this, I guess, first BEC scheme,

each of the transactions from the new account, I guess, to the

subsequent conspirator accounts went through a server in

Minnesota, correct?

**A.**     Correct.

**Q.**     Was there any -- in the course of the investigation, did

the government find any connection between that server and

1    Mr. Elkhebri or any of the other defendants?

2    **A.**    Yes.

3    **Q.**    What was that?

4    **A.**    So when we subpoenaed the bank accounts, we clarified on

5    what servers the locations were. So when we asked them where

6    they stored their information or where the information for

7    ATMs -- or accessing it was, it was stored in servers in

8    Minnesota.

9    **Q.**    So what particular evidence was there connecting

10    Mr. Elkhebri to the server in Minnesota?

11    MR. HOOD: Your Honor, I want to object because I

12    understand that counsel has an incentive to try to cross-examine

13    the witness, but as laid out in the complaint, this is not an

14    exhaustive list of all the evidence that we have. It's only what

15    is necessary to provide probable cause to the arrest, and the

16    questions that have been asked are going far beyond what is

17    necessary to provide probable cause.

18    THE COURT: Well, I'm going to overrule the objection.

19    Counsel can ask questions about what's in the affidavit.

20    Certainly, if the agent can answer them, he can answer them. If

21    he doesn't, we'll move on. This is not free-ranging discovery,

22    but the objection's overruled for the time being.

23    MS. ROBIN: Thank you, Your Honor.

24    BY MS. ROBIN:

25    **Q.**    Would you like me to repeat that?

**A.**     Yes, please.

**Q.**     What, if any, evidence -- when you retrieved these records in connection with the server in Minnesota, what, if any, evidence was there to connect Mr. Elkhebri to the server in Minnesota?

**A.**     I can't remember specifically at this time.

**Q.**     According to the chart in paragraph 19, $25,000 of the proceeds from the first alleged fraud went into the Bank of America account ending in 2125 that's associated with Mr. Elkhebri and Mr. Ibeh --

**A.**     Correct.

**Q.**     -- correct?  Okay.

Now, paragraph 24 goes on to say that there were three withdrawals from that account thereafter totalling roughly 900 -- $9,100, correct?

**A.**     You said paragraph 25?

**Q.**     Paragraph 24, I believe.

**A.**     I'm sorry.  Correct.

**Q.**     Okay.  And so my question about the withdrawals is this: Do you know is there any evidence to suggest that Mr. Elkhebri, as opposed to someone else, made those withdrawals?  In other words, the account had dual access, correct?

**A.**     Correct.

**Q.**     Okay.  Do you have any definitive evidence that Mr. Elkhebri is the one that made those withdrawals?

**A.**     I can't recall at this time.  I know that Elkhebri's name is tied to it.

**Q.**     I'm sorry?

**A.**     I don't have -- I don't have specific evidence that I recall at this time, but his name is signed on the signature card.  He has access.  According to the bank, it's his account he's responsible for.

**Q.**     Sure.  I think we all understand from the affidavit that he had access to the account and that Mr. Ibeh had access to the account as well.

**A.**     Correct.

**Q.**     My question is do you have evidence as to who made those particular withdrawals?

**A.**     We have videos and stills of different ATM transactions. I can't recall specifically at this time Elkhebri or --

**Q.**     Okay.  So you have video and stills from these particular transactions?

**A.**     I have videos and stills of transactions.  I can't specifically say that I recall if it was specifically who you're asking about.

**Q.**     Okay.  So your answer is you don't --

**A.**     I don't recall.

**Q.**     -- right now --

**A.**     Correct.

**Q.**     -- testifying today of any evidence suggesting that it

1    was Mr. Elkhebri that made those withdrawals?

2    **A.**    I can't recall, correct.

3    **Q.**    Okay.  Paragraph 29 discusses a series of debits from a

4    bank account associated with Mr. Ayeah -- actually, I guess for

5    brevity's sake, I'll skip over this.

6         Well, let me just ask you this:  There are -- some of

7    those transfers that they discuss in paragraph 29 involves Bank

8    of Jiangsu, an international wire to the Bank of Jiangsu.  Were

9    you able to determine whose account that was?

10   **A.**    I can't recall whose account that was, no.

11   **Q.**    Okay.  It wasn't, in any event, connected to

12   Mr. Elkhebri, though, correct?

13   **A.**    I can't recall.

14   **Q.**    Okay.  What about the wire transaction to LMX Towson,

15   LLC; no evidence that was connected to Mr. Elkhebri, correct?

16   **A.**    I can't recall.

17   **Q.**    Paragraph 34 discusses a series of debits from a TD

18   account, 0414, that was allegedly controlled by Mr. Joyner.

19   None of these debits were linked to my client, Mr. Elkhebri,

20   correct?

21   **A.**    To the best of my knowledge, Mr. Elkhebri's name was used

22   to open the account while he was employed as a bank employee.

23   **Q.**    It was linked to the TD account allegedly controlled by

24   Mr. Joyner?

25   **A.**    To the best of my knowledge, that's what I recall.

1    **Q.**    Because -- you're talking about -- if we skip over to, I

2    think it's paragraph 41 that discusses my client's employment

3    records.  In that -- so the TD Bank account that he opened

4    multiple conspirator accounts including an account that Ayeah

5    used in furtherance of this scheme at TD Bank, but it doesn't

6    mention an account by Joyner at TD Bank.

7    **A.**    In 42, it says, "During his time at TD Bank, Elkhebri

8    opened multiple conspirator accounts including an account that

9    Ayeah used in furtherance of the scheme."

10   **Q.**    Right.  But the one I'm asking about, paragraph 34, was

11   controlled by Joyner, not Ayeah.

12   **A.**    Right.  I'm sorry, I was getting confused because you

13   asked me about two separate ones for Ayeah.  Can you give me a

14   second to review this?

15   **Q.**    Absolutely.  Take your time.

16   **A.**    Can you repeat the question?

17   **Q.**    Sure.  My original question was this:  Paragraph 34

18   discusses a series of debits from the TD-0414 account controlled

19   by Joyner.  Is there any evidence that Mr. Elkhebri was linked

20   to any of these debits?

21   **A.**    I can't recall at this time.

22   **Q.**    Okay.  And just to be clear, there's only one TD account

23   that's mentioned throughout this entire affidavit, and it's the

24   account referenced in paragraph 34, controlled by Joyner,

25   correct?

**A.**     I don't have the list of all the TD accounts that were

involved in front of me.  I can't recall.

**Q.**     Okay.  Well, I mean, feel free -- it doesn't -- feel free

to skim through.

**A.**     Correct, the affidavit only includes the one TD Bank for

Joyner.

**Q.**     Okay.  And while we're on the topic of the accounts, am I

correct that all of the mule accounts were Wells Fargo accounts?

All of the mule accounts in this affidavit anyway.

**A.**     I don't want to say definitively "all," so I'm just going

to say that I can't recall that every single one of them was.

**Q.**     Okay.  Let me rephrase it.  Are all of the mule accounts

that are identified in this affidavit a Wells Fargo account?

**A.**     Again, there are quite a few mule accounts involved in

this case.  I can't recall if the ones involved for these

specific individuals were only Wells Fargo accounts.

**Q.**     I understand that.  I'm only asking about the mule

accounts identified in this affidavit for the four BEC schemes.

**A.**     Where are you looking on that?  For the Wells Fargo?

**Q.**     I'll have to direct you.  The BEC scheme involving

Victim 1 spans from -- was clearly a Wells Fargo account --

**A.**     Correct.

**Q.**     -- in paragraph 7, right?

**A.**     Mm-hmm.

**Q.**     We're in agreement on that.  So the BEC scheme, I think,

1   for Victim 2 begins on paragraph 43, and that -- and

2   paragraph 44 seems to reflect that it was a Wells Fargo account

3   as well --

4   **A.**     Correct.

5   **Q.**     -- correct?  Okay.

6          And then for the BEC scheme for Victim 3 -- this is

7   paragraph 45 -- and let's see -- I think in 45 and 46, you can

8   see that the mule account was Wells Fargo as well, correct?

9   **A.**     Correct.

10  **Q.**     And then the BEC scheme for Victim 4 starts on

11  paragraph 47?

12  **A.**     Correct.

13  **Q.**     And you can see in that same paragraph, the mule account

14  appears to be Wells Fargo as well?

15  **A.**     Correct.

16  **Q.**     Okay.  Mr. Elkhebri never worked at Wells Fargo, though,

17  correct?

18  **A.**     To the best of my knowledge, yes.

19  **Q.**     Okay.  So he didn't open any of those accounts, correct?

20  **A.**     Not to my knowledge.  Not that I can recall.

21  **Q.**     Paragraph 36 includes a chart of various IP addresses,

22  and it indicates that the, I guess, Wells Fargo and Bank of

23  America produced IP addresses that had access to the conspirator

24  accounts.  Do you -- when you said "that had access to the

25  conspirator accounts," do you mean all of the conspirator

1  accounts or just particular ones?

2  **A.**     I'm sorry, are you asking if -- you're asking if the --

3  if these IP addresses were connected to every single account

4  or just some?

5  **Q.**     Yes.

6  **A.**     The I -- correct, the IP addresses were for specific

7  accounts.

8  **Q.**     Okay.  Do you know which specific accounts?  Just the

9  ones from Wells Fargo and Bank of America, I presume?

10  **A.**     Just the ones listed, correct.

11  **Q.**     I'm sorry, I don't think they're listed; that's why I'm

12  asking.

13  **A.**     Okay.  The IP -- the IP that I recall, to the best of my

14  knowledge, was for the -- was for the Bank of America with

15  Elkhebri.

16  **Q.**     Okay.  Just for that one account, okay.

17  **A.**     Right.

18  **Q.**     And to be clear, none of those IP addresses were

19  connected to Mr. Elkhebri, correct?

20  **A.**     Correct.

21  **Q.**     Okay.  Paragraph 40 states that Bank of America produced

22  surveillance footage for certain ATM transactions involving Bank

23  of America account ending in 4059 -- I may have asked you this

24  earlier -- but you're not aware of any footage showing

25  Mr. Elkhebri in those, correct?

**A.** Correct. This is surveillance photos of Mr. Ayeah.

**Q.** I beg your pardon?

**A.** This is surveillance photos -- or surveillance evidence of Mr. Ayeah.

**Q.** Okay. So it doesn't include any surveillance photos of Mr. Elkhebri?

**A.** For that specific account, yes.

**Q.** Okay. The -- paragraph 41 states that Mr. Elkhebri opened multiple conspirator accounts while at Bank of America between 2015 and 2017, correct?

**A.** Correct.

**Q.** And just to be clear, when you say multiple -- "opened multiple conspirator accounts," are you talking -- there's only -- let's see -- three Bank of America accounts referenced in this affidavit. Are those the multiple ones you're talking about, or are you talking about something else?

**A.** I can't recall specifically, but those with Mr. Elkhebri's name listed on the accounts are generally -- but he did open accounts for Mr. Ayeah and Mr. Joyner or -- yeah.

**Q.** Okay, I know, but Mr. Joyner didn't have an account at Bank of America, at least not in the affidavit.

**A.** I don't recall specifically which account he opened at this time.

**Q.** Okay. So in any event, at Bank of America, we know that Mr. Elkhebri worked there from roughly 2015 to 2017, and we know

1  that this conspiracy didn't begin until at least, at the

2  earliest, 2018, correct?

3  **A.**    Correct.

4  **Q.**    Okay.  So -- and you don't know when Mr. Elkhebri opened

5  these particular accounts --

6  **A.**    I don't recall.

7  **Q.**    -- between May 2015 and 2017, so it could have been years

8  before the conspiracy began?

9  **A.**    I don't recall.

10  **Q.**    Okay.  Let's see.  Paragraph 44 discusses several

11  deposits that were supposedly involved in the proceeds from the

12  fraud on Victim 2.  Are you -- are you at paragraph 44?

13  **A.**    I'm sorry, can you repeat that?  I didn't hear that

14  question.

15  **Q.**    Paragraph 44, it discusses several deposits.  There's a

16  chart as well.  It discusses several deposits that were

17  supposedly involved in the proceeds from the fraud on Victim 2,

18  correct?

19  **A.**    Correct.

20  **Q.**    Okay.  And two of those deposits went into the BOA-2125

21  account that's linked to Mr. Elkhebri and Mr. Ibeh, correct?

22  **A.**    Correct.

23  **Q.**    Is there any evidence that Mr. Elkhebri attempted to

24  withdraw those proceeds?

25  **A.**    I don't recall at this time.

**Q.**     Okay.  And is there any evidence -- I know, in the
affidavit, you mention that Mr. Ibeh had, I guess, online access
to the account and password and so forth.  Do you know whether
or not Mr. Elkhebri had the online access as well, or was the
online user name just for Mr. Ibeh?

**A.**     His email is attached to that as well.

**Q.**     Whose; Mr. Elkhebri?

**A.**     Yes.

**Q.**     His email is attached to it, but I guess my question is
there's a -- for an online bank account, there's a user name and
a password, correct?

**A.**     Correct.

**Q.**     How did you link Mr. Ibeh to that online other than
through IP address?

**A.**     Through IP address, his name -- through the IP address,
it's showing him accessing it from his apartment at the time.

**Q.**     Okay.  Was -- and then also his name?

**A.**     And his -- his email -- Mr. Ibeh's email is attached to
that as well.

**Q.**     Okay.  And Mr. Elkhebri was not, to your knowledge, was
not living with Mr. Ibeh at the time that the IP address was
linked to Mr. Ibeh?

**A.**     Not to my knowledge.

**Q.**     Okay.  Paragraph 48 reads, "Ultimately, the funds from
Victim 4 were transferred to other conspirators," and it then

1    contains a chart of conspirator accounts where the proceeds were

2    transferred.  My question is this:  If the fraud against

3    Victim 4 wasn't perpetrated until July 2nd -- which is what it

4    says, you know, in paragraph 48 -- then the first four deposits

5    on this chart that occurred between June 4th and June 13th, they

6    can't possibly be related to that BEC fraud, correct?

7    **A.**    I can't recall.

8    **Q.**    Okay.  Well, you would agree that the affidavit states

9    that the BEC fraud occurred -- for Victim 4 occurred on July --

10   the first one occurred on July 2nd of 2018 where the account was

11   credited $63,174.33, correct?

12   **A.**    Correct.

13   **Q.**    Okay.  And the chart clearly contains deposits that are

14   prior to that date.  My question is, if the fraud didn't occur

15   until July 2nd, why -- how can the June deposits possibly be

16   related to a fraud that hasn't occurred yet?

17   **A.**    I can't recall.  I don't want to speak on something I'm

18   remembering incorrectly, so I can't recall.

19   **Q.**    Okay.  Well, would it refresh your recollection to read

20   the entirety of paragraph 47?

21          (Pause in the proceedings.)

22   **A.**    I don't recall at this time.  I don't want to speak on --

23   **Q.**    The last topic I want to ask you about is the Bank of

24   America account ending in 2125 connected to Mr. Elkhebri and

25   Mr. Ibeh; do you know when that account opened?

**A.**      I can't remember the specific date.

**Q.**      Okay.  I mean, is it fair to say that it opened sometime between 2015 and 2017 when Mr. Elkhebri worked at the Bank of America?

**A.**      It's fair.

**Q.**      Do you know when it was closed?

**A.**      I can't remember off the top of my head.

**Q.**      Okay.  Do you know whether there were -- whether there were any other accounts connected to Mr. Elkhebri?  And when I say "connected," I mean that he actually was either, you know, a signatory or an owner of the account.  Any other accounts connected to Mr. Elkhebri there were determined to be involved in fraudulent activity?

**A.**      I can't recall anything not listed on the affidavit.

**Q.**      And do you know what particular withdrawals from that BOA-2125 account police were able to -- or the government was able to link to Mr. Elkhebri making withdrawals as opposed to someone else?

**A.**      We based it mostly off the signature on the account.

**Q.**      When you say "the signature on the account" --

**A.**      The signature card when the account is opened.

**Q.**      So not like an individual signature on a withdrawal slip or something like that?

**A.**      Not that I could recall at this time.

**Q.**      Okay.

1    MS. ROBIN:  No further questions.

2    THE COURT:  Ms. Meleen?

3                    CROSS-EXAMINATION

4  BY MS. MELEEN:

5  **Q.**    Good afternoon, Agent.

6  **A.**    Good afternoon.

7  **Q.**    I actually represent Mr. Joyner.

8  **A.**    Okay.

9  **Q.**    I want to ask you some questions about Mr. Joyner.

10    Do you -- did your investigation show that there was any

11 connection between Mr. Joyner and Mr. Elkhebri?

12 **A.**    Not that I could recall.

13 **Q.**    Okay.

14 **A.**    I can't recall.

15 **Q.**    And do you have any reason to believe that Mr. Elkhebri

16 opened the account that is associated with Mr. Joyner?

17 **A.**    I can't recall.

18 **Q.**    When you were asked on direct how you knew that

19 Mr. Joyner was involved in this, you mentioned two things.  You

20 said that his name was on the signature card of some accounts.

21 **A.**    Correct.

22 **Q.**    Okay.  Can you tell me what accounts they were?

23 **A.**    TD-0414, his name is on that account.

24 **Q.**    Is there more than one?

25 **A.**    Do you mind if I --

**Q.**     Absolutely, go ahead.

**A.**     To the best of my knowledge, that's -- his name is on just that account.

**Q.**     Just that one.

And in the affidavit, it indicates the signature card for TD-0414 account dated September 7, 2018, lists the owner of the account as Joyner.  Did you -- did your investigation include verifying that he had actually endorsed the card, that he had signed the card?

**A.**     We have evidence that shows him making ATM withdrawals and transfers for that account.

**Q.**     That would come later, though, correct?  As far as the signature card --

**A.**     Correct.

**Q.**     -- am I correct that --

**A.**     Yeah, his signature card is --

**Q.**     -- is when you open the account?

**A.**     Correct.

**Q.**     Okay.  Is that a typed signature or is it his signature?

**A.**     I can't recall.

**Q.**     Okay.  And so then you did mention also the other reason that you thought that he was involved is the video evidence. Are you talking about ATM videos?

**A.**     ATM and bank.

**Q.**     Okay.  And so if I were to draw your attention to

1    paragraph 34, which -- I'll let you get there.

2    **A.**    Mm-hmm.

3    **Q.**    Are you there?

4    **A.**    I'm there.

5    **Q.**    Those are the withdrawals from that TD Bank account,

6    right?  Can you tell us what videos are associated with those

7    withdrawals listed in that paragraph?

8    **A.**    I don't want to point on specific -- on which specific

9    instances he made withdrawals, but we have evidence that shows

10   him making withdrawals for the bank in question and for some of

11   those amounts.

12   **Q.**    Okay.  And would all of the videos that you think you

13   have be related to this one particular account?

14   **A.**    To TD-0414?

15   **Q.**    All the videos of Mr. Joyner.

16   **A.**    Yes.  Yes.

17   **Q.**    In fact, you don't have any evidence anywhere of

18   Mr. Joyner being associated with any other of these bank

19   accounts; is that right?

20   **A.**    Not that I -- I can't recall.

21   **Q.**    Okay.  And the one -- the TD bank account that we're

22   talking about only has two deposits; is that right?

23   **A.**    Are you speaking of the 50,000 and the 31,000?

24   **Q.**    Right, the ones that are listed in paragraph 19 --

25   **A.**    Correct.

**Q.** -- those are the correct amounts that you have listed with his name on it?

**A.** Correct.

**Q.** 50,000 and 31,900?

**A.** Correct.

**Q.** And his name doesn't appear on any of the other accounts, or there are no more deposits other than those two?

**A.** I can't recall. I don't want to be definitive on it, but we listed what we believe was probable cause for this case on this affidavit.

**Q.** Okay. Do you know how those deposits were made -- well, first let me ask you more specifically so it's easier. Do you know how the deposit on December 11th was made, December 11, 2018?

**A.** The deposit to the account?

**Q.** Yes.

**A.** I can't remember exactly which deposit that was made to. I don't want to say what I believe if I'm not definitive.

**Q.** Is your memory the same on the deposit of December 12, 2018?

**A.** I don't want to specifically point to the individual account in question, on where it came from.

**Q.** Okay. Do you know whether this bank account -- or the TD Bank account was frozen while there was still money in it or not?

**A.**     I can't recall what the exact status was when it was

frozen or not.

**Q.**     Okay.  And going back to the money that came out of this

account in paragraph 34 --

**A.**     Mm-hmm.

**Q.**     -- when you indicate at the very end where it says

December 17, 2018, additional account debits included $3,725.99

and ATM withdrawals; are those ATM withdrawals or are those

using it as a debit card?  What do you mean by that?

**A.**     If I recall correctly, it was ATM withdrawals.

**Q.**     Okay.  So everything that came out of this account that

you have indicated either came out in cash or one wire transfer?

**A.**     I can't recall.  I don't want to use broad terms.  I

can't recall specifically how each individual transfer was --

use of the money in this account was made with, if that makes

sense.

**Q.**     I'm going to ask you about paragraph 39 --

**A.**     Okay.

**Q.**     -- which indicates at least one of the video transactions

featured an individual who matches the known height, weight, and

body type of Joyner.

**A.**     Yes.

**Q.**     Were there transactions, video transactions, that did not

meet that description?

**A.**     Not that I recall.  We list this just to be thorough in

1 how we identified him in those specific videos for him making --

2 I can't recall. Are you asking if anybody else accessed the

3 account not matching his --

4 **Q.**    Well, I'm asking you specifically about that at least

5 one. It sounds like they didn't all.

6 **A.**    We say at least one because we have multiple photos and

7 videos of him matching that description.

8 **Q.**    Okay. And with respect to Victim Number 2 in the

9 affidavit, Mr. Joyner is not mentioned at all?

10 **A.**    Can you give me a second to --

11 **Q.**    Sure.

12 **A.**    Correct, he's not listed on this.

13 **Q.**    With respect to Victim Number 3, Mr. Joyner is not listed

14 at all?

15 **A.**    Correct.

16 **Q.**    And with respect to Victim Number 4, Mr. Joyner's not

17 listed at all?

18 **A.**    Correct.

19     MS. MELEEN:  I don't have any other questions.

20     THE COURT:  Thank you.  Any redirect?

21     MR. HOOD:  Very briefly.

22                  REDIRECT EXAMINATION

23 BY MR. HOOD:

24 **Q.**    Special Agent Papish, thank you very much for your

25 patience in dealing with -- just a couple follow-up questions.

So the first, how long has this investigation been going on?

**A.**     It's been going on since 2019.

**Q.**     So years?

**A.**     Yes.

**Q.**     Do you have any sense of how many documents we've received in this case?

**A.**     A lot.

**Q.**     Is it safe to say it's more than a thousand?

**A.**     Yes.

**Q.**     Is it safe to say it's more than 10,000?

**A.**     Yes.

**Q.**     Is it safe to say it's more than a hundred thousand?

**A.**     There are a lot of documents in this case.

**Q.**     Yeah.  How many agents are working this case with you?

**A.**     Myself and two others.

**Q.**     So does that mean that the investigative duties are spread amongst the three people?

**A.**     Yes, to make sure the case is moving forward and that someone is always working towards the case, correct.

**Q.**     And the facts based on this affidavit are based on not only your personal things, but also there are conversations that you've had with the other agents as well?

**A.**     Correct.

**Q.**     This affidavit you have, turn to paragraph 2, please.  So I'll -- the last sentence of paragraph 2 says, "This affidavit

1  does not include each and every fact known to the government,

2  but only those facts necessary to support a finding of probable

3  cause to support the requested criminal complaint."  Did I read

4  that right?

5  **A.**    Correct.

6  **Q.**    Is that your understanding?

7  **A.**    Yes.

8  **Q.**    So this compliant doesn't include everything that we

9  know, right?

10  **A.**    Correct.

11  **Q.**    It includes a fraction of what we know?

12  **A.**    Correct.

13  **Q.**    Okay.  So let's talk about the victims.  So in this

14  complaint, we mention how many victims again?

15  **A.**    In this complaint, we mention four.

16  **Q.**    But the bulk of it is spent on one of them; is that

17  right?

18  **A.**    Correct.

19  **Q.**    And there's more victims that we know of, right?

20  **A.**    Correct.

21  **Q.**    And there's more domestic victims, correct?

22  **A.**    Correct.

23  **Q.**    And more foreign victims, correct?

24  **A.**    Correct.

25  **Q.**    Let's talk about the transactions.  There's several

1     transactions that are listed here.  Does this include all of the

2     transactions that we're aware of?

3     **A.**    No.

4     **Q.**    I'd like to direct your attention to paragraph 18 of the

5     complaint.  So the last sentence of paragraph 18 says, "The

6     conspirator accounts includes those specified in this criminal

7     complaint and additional counts involved in that scheme."  Did I

8     read that correctly?

9     **A.**    Correct.

10     **Q.**    Is that your understanding today?

11     **A.**    Correct.

12     **Q.**    So when it says "conspirator accounts," it includes the

13     accounts listed in this complaint, but also a whole bunch of

14     other accounts that we didn't have time to include; is that

15     right?

16     **A.**    Yes.

17     (Indiscernible objection made by an unidentified speaker.)

18     THE COURT:  Well, the rules of evidence don't apply at

19     preliminary hearings, but let's stay focused on what we're doing

20     here, which is an issue of probable cause.  Mr. Hood, if there's

21     anything left, let's wrap it up.

22     MR. HOOD:  Okay.

23     BY MR. HOOD:

24     **Q.**    Very briefly.  Are you familiar with the company Elkhebri

25     Transportation?

1    **A.**    Yes.

2    **Q.**    Are you familiar with the company Petra Transportation?

3    **A.**    Yes.

4    **Q.**    Are both of those companies involved in this fraudulent

5    scheme?

6    **A.**    Yes.

7    **Q.**    Are both of those companies tied to a defendant?

8    **A.**    Yes.

9    **Q.**    Do you know which defendant they're tied to?

10   **A.**    Yes.

11   **Q.**    Have you received any information about this case since

12   the complaint was sworn out?

13   **A.**    Yes.

14   **Q.**    And is there anything that you have seen since that day

15   that has changed your belief that these three defendants

16   committed the offenses alleged in the complaint?

17   **A.**    No.

18        MR. HOOD:  No further questions, Your Honor.

19        THE COURT:  Thank you.  You may step down.

20        THE WITNESS:  Thank you, Your Honor.

21        MS. ROBIN:  Your Honor, if I may, I do have one follow-up

22   question, if the Court will permit me, in light of the question

23   about whether or not Elkhebri Transportation is involved in the

24   scheme.

25        THE COURT:  No, we won't do surrebuttals to the redirect.

1   Thank you, though.

2       Does the government have any other evidence it wishes to

3   present with regard to probable cause?

4       MR. HOOD:  Not at this time, Your Honor.

5       THE COURT:  Do any of the defendants wish to present any

6   evidence with regard to the issue of probable cause?

7       MR. HUTCHESON:  No, thank you.

8       MS. MELEEN:  No evidence.

9       MS. ROBIN:  No.

10      THE COURT:  Thank you.  Do any of the defendants wish to

11  make any argument?

12      MS. ROBIN:  Yes, sir.

13      THE COURT:  Okay.

14      MS. MELEEN:  I do want on behalf of Mr. Joyner.

15      So as far as probable cause goes, I don't have an issue

16  with whether or not they established probable cause that an

17  offense occurred, but the link to Mr. Joyner is very tenuous.  It

18  appears to be that the link is that there is an account, it is

19  opened at TD Bank that has his name on the signature card.  Agent

20  can't say if it's typewritten, if he signed it.  There's no

21  evidence that he went in and opened the account.

22      And then there's evidence that on at least one occasion,

23  there are videos showing that he withdrew money from it.  So his

24  name is on the account and he did a withdrawal.  That's the only

25  link to Mr. Joyner.  And I -- it's not enough for probable cause

1    that he was involved in this or that he even knew that there was

2    a fraudulent scheme.

3         THE COURT:  Okay.  We can hear all the arguments at once

4    and then we could have the government respond.

5         Ms. Robin, you were jumping up to make your argument.  Go

6    ahead.

7         MS. ROBIN:  I apologize, Your Honor.

8         THE COURT:  That's all right.

9         MS. ROBIN:  I should have asked how you wanted to handle

10   the order.

11        THE COURT:  It's okay.

12        MS. ROBIN:  With respect to Mr. Elkhebri, Your Honor, I

13   would just point out a couple of things.  I know, obviously,

14   we're only at the probable cause stage, but I feel compelled to

15   point out there's no evidence at all that Mr. Elkhebri was

16   involved in the BEC schemes or the domain names; no evidence

17   linking him to the mule accounts from Wells Fargo; no evidence

18   that he withdrew any of the proceeds from the single account that

19   he owned or had access to, the Bank of America-2125 account,

20   which, importantly, was co-accessed by one of the codefendants.

21   So there's not even any evidence that Mr. Elkhebri knew that this

22   money was even in the account, let alone that he withdrew it.

23        I think, at a minimum, certainly, the government has to

24   prove an agreement on Mr. Elkhebri's part to enter into a

25   conspiracy to commit fraud, and all they have is his name on an

1  account that is co-accessed by a codefendant and nothing more.

2  So I would submit that that doesn't establish probable cause.

3  Thank you.

4          THE COURT:  Mr. Hutcheson?

5          MR. HUTCHESON:  No, Your Honor.

6          THE COURT:  Mr. Hood?

7          MR. HOOD:  Very briefly, Your Honor.  As laid out in the

8  complaint, and, again, the agent adopted the facts of the

9  complaint -- or, rather, the affidavit in support of the

10  complaint as part of his testimony, so I'll do my best to not

11  repeat the testimony that he gave, the voluminous testimony that

12  he gave.

13          As for Mr. Elkhebri, it's clear that he co-opened the

14  account with Mr. Ibeh.  His name is on the account.  His

15  signature is on the account.  That account regularly received the

16  proceeds of the fraud.  Again, the account was in his name.

17          Beyond that, he took several actions in furtherance of the

18  conspiracy, including as his time as an employee of the various

19  banks, including when he opened an account -- multiple accounts

20  that were used in furtherance of this conspiracy.

21          Mr. Joyner, again, is a person who received the money in

22  furtherance of the scheme.  He received the proceeds of the fraud

23  into his account, and we have not one, not two, not three, but

24  multiple instances of Mr. Joyner accessing the account,

25  withdrawing money from the account.  I'll leave it there.

1          And beyond the evidence that's included in the complaint,

2     there is also -- we have evidence of not only that the

3     conspirators knew each other, but that they regularly

4     communicated with each other, further showing that they had this

5     agreement to participate in this conspiracy together.

6          THE COURT:  Thank you.

7          This matter comes before the Court on preliminary hearing.

8     The question is whether there's probable cause to have these

9     matters held over for action by the grand jury.  I've listened to

10    the testimony of the agent, reviewed the affidavit.

11         The standard for probable cause is, of course, very low.

12    It's whether there's some evidence to support the charges.  This

13    is not the trial of the matter, and there will be every

14    opportunity, if the Court finds probable cause, to challenge the

15    evidence at an appropriate time.

16         The claims here are of a wide-ranging and complex

17    financial fraud involving, by its nature, surreptitious activity

18    and, in fact, the use of stealth to impersonate others in order

19    to obtain money.  There is substantial evidence that these

20    victims, in fact, lost this money and were tricked into sending

21    it to places they did not intend it to go.  There also appears to

22    be substantial evidence that these defendants received that

23    money, whether or not they were joint holders of these accounts,

24    as was the case with Mr. Elkhebri, or they were the individual

25    holders of the accounts.  There also is evidence, at least with

1    regard to Mr. Joyner, that he accessed the money himself.

2         It is a close call and a legitimate argument that has been

3    raised based on the information before me, but I don't think that

4    I could find at this stage that there is an insufficient basis

5    for meeting the very low standard of probable cause.  There

6    simply are too many leaps of logic to conclude the

7    extraordinarily bad luck and coincidence of being the owners of

8    accounts in this circumstance and the beneficiaries of this

9    enormous amount of money based on the information presented here.

10        In addition, it is clear that, and there are references

11   to, additional information that is not set out in detail, but I

12   do find that the circumstances presented and the evidence as a

13   whole does meet the low standard of probable cause to have these

14   matters held over for all three defendants for further action by

15   the grand jury.

16        Is there anything else with regard to these three

17   defendants that I need to address this afternoon?

18        MR. HUTCHESON:  Your Honor, with regard to conditions of

19   release for Mr. Ayeah, he is precluded by your order of yesterday

20   from having certain computer access or even his cell phone, and

21   then there's another condition of his release that says he's to

22   seek and find employment; and he makes a point to me, which is

23   valid, that in this day and age, you can't really apply for a job

24   without making an application on a computer.  And so that --

25   these conditions seem overbearing.  It's obvious to me -- I would

1    hope that the Court would give him the benefit of the doubt --

2    that even if this probable cause finding leads to an inference of

3    guilt, that he's not going out committing, you know, business

4    whatever, BEC activity.  And I would ask Your Honor to amend

5    those terms so that he can, in fact, use his computer and use his

6    cell phone and be on the PlayStation platform, just with the

7    condition that he not use it for any unlawful or any untoward

8    behavior.  And the pretrial service office is supposed to be

9    coming on, I believe, the 26th of this month, of August, to

10   install this software that is going to aid in monitoring, but I

11   think he can be trusted with the knock over the head that, Hello,

12   you've just been arrested yesterday and are under federal

13   conditions, that he's not going to jeopardize his position by

14   abusing the conditions that Your Honor would impose.  And I would

15   ask you to remove those restrictions on his use of computer and

16   cell phone.  Thank you.

17        THE COURT:  Thank you.  So your understanding is that

18   Pretrial Services is not able to install the monitoring software

19   until the 26th of August?

20        MR. HUTCHESON:  That's what my client informs me, and

21   that's almost two weeks away.

22        THE COURT:  We don't have anyone from Pretrial Services

23   here; is that correct?  Yes.

24        Well, I will deny your request at this time.  I appreciate

25   the challenge that is faced in not being able to access the

1    internet to the extent Pretrial Services can't accelerate that

2    process.  I'm surprised to hear that it would take that long.

3    The intention of those conditions is not to prevent access to the

4    internet or to be able to do the things that are necessary to get

5    and maintain a job.  It's to make sure that there's an ability to

6    monitor that.  So as I understand what you're saying is that

7    Pretrial Services -- and it may well be that there are pressures

8    on their personnel as such -- that they simply can't get out

9    there sooner, but I will look into that and see, but I'll deny

10   your request at this time, but hope that we might be able to

11   speed up that --

12         MR. HUTCHESON:  May I have permission to contact Pretrial

13   and suggest that Your Honor asked them to speed that up a little

14   bit?

15         THE COURT:  You don't need to do so.

16         MR. HUTCHESON:  All right.

17         THE COURT:  Thank you.

18         MR. HUTCHESON:  Thank you, Your Honor.

19         THE COURT:  Is there anything else that we need to

20   address?

21         MS. ROBIN:  No, Judge.

22         THE COURT:  Thank you.  Before we leave, I think I need to

23   comply with the Due Process Protections Act, which has not been

24   done since this is the first time that defense counsel is here,

25   and so I will remind the government and confirm that they

1 | understand their obligations under Brady and its progeny to

2 | provide all material and exculpatory evidence, and that they

3 | understand that failure to do so could lead to sanctions up to

4 | and including dismissal of the charges.

5 | Is it correct that the government understands and intends

6 | to abide by those obligations?

7 | MR. HOOD: Yes, Your Honor.

8 | THE COURT: Thank you. I will enter a written order in

9 | conformity with the statute reflecting that.

10 | The bonds are continued at this time, and the case is

11 | continued until further action by the grand jury. The three of

12 | you may step out of the jury box and leave at this time.

13 | I see, Mr. Jenkins, you are here. If you'll come forward.

14 | I know that you were otherwise indisposed. I'm sorry that I

15 | could not delay matters all together. Is your client still here?

16 | MR. JENKINS: May it please the Court, Your Honor. I do

17 | not know. I arrived, parked, and immediately came in. I had

18 | informed him that I would meet him in the courtroom.

19 | THE COURT: You may come forward, Mr. Jenkins, and you-all

20 | may leave while we have a discussion.

21 | (Thereupon, an off-the-record discussion was held.)

22 |

23 |

24 |

25 |

<u>CERTIFICATE OF REPORTER</u>

I, Diane Salters, certify that the foregoing transcript of proceedings was prepared from an FTR Gold audio recording of proceedings in the above-entitled matter and was produced to the best of my ability.  Indiscernible indications in the transcript indicate that the audio captured was not clear enough to attest to its accuracy.

/s/ Diane Salters                                      May 11, 2022
_____                          _____
Diane Salters, CSR, RCR, RPR                     Date
Official Court Reporter

1              INDEX

2

3            WITNESSES

4

FOR THE GOVERNMENT     DIRECT    CROSS    REDIRECT    RECROSS

5

6  **ETHAN PAPISH**

7  BY MR. HOOD              6                    39

8  BY MR. HUTCHESON              12

9  BY MS. ROBIN                  16

10 BY MS. MELEEN                 34

11

12

13

14         GOVERNMENT'S EXHIBITS

15

16            NO.                     RECEIVED

17             1                         9

18

19

20

21

22

23

24

25